## 13677.   KENNEDY *v.* BUCKEYE COTTON OIL COMPANY.

The contract was unambiguous, there was no issue of fact to be submitted to the jury, and the trial judge properly directed a verdict.

Where cottonseed are pledged to secure a debt, with an agreement that the pawner is "to secure the highest market price" for them, and that in the event the pawnee is not in the market or is unable to meet competitive bids it will be satisfactory for the pawner to sell the seed to some other person and liquidate the indebtedness with the proceeds of such sale, this necessarily means that if the pawnee is in the market and does meet competitive bids and pays the highest market price for such collateral, he has the privilege of buying the seed, and the taking over of the collateral by the pawnee, under such an agreement, at the highest market price at the time of the sale, and at a time specified in the agreement, is not a wrongful conversion of the collateral.

Complaint; from city court of Dunblin — Judge Sturgis. April 29, 1922.

The Buckeye Cotton Oil Company sued Jerome Kennedy on an open account for a balance of $1,027.04, alleging that the plaintiff advanced to the defendant (a cottonseed buyer) money at certain intervals, and the defendant bought cottonseed and shipped them to the plaintiff as collateral for such indebtedness; that the seed were sold by the plaintiff to itself at $20 per ton, and the proceeds of the sale were credited on the defendant's account, and that the sum stated above is the balance due by defendant to plaintiff after such credit. The defendant, in his amended answer, admitted the cash advances made to him by the plaintiff, but alleged a conversion of his collateral by the plaintiff, for which he claimed a set-off of $6,100, and prayed for a judgment for $3,100 in excess of his indebtedness to the plaintiff. Certain correspondence be-

tween the parties litigant is set out in the record and admitted to be the contract under which they were dealing. Upon the trial of the case these letters were introduced with other evidence as to the market value of the cottonseed at the time of the alleged conversion, the defendant himself testifying that $21 per ton was the highest market value. After all the evidence had been introduced the judge directed that the defendant be allowed an additional credit of $123, which brought the sum paid for the collateral up to $21 per ton, the highest market value proved at the time of the sale; and he then directed a verdict for the plaintiff for the balance, $903.04. The defendant's motion for a new trial was overruled; and he excepted to the direction of the verdict and to the overruling of the motion for a new trial.

*J. S. Adams, R. Earl Camp,* for plaintiff in error.

*Brock, Sparks & Russell,* contra.

BLOODWORTH, J. (After stating the foregoing facts.) The entire record in this case raises three issues: 1. Did the trial judge err in directing a verdict? 2. Was there a wrongful conversion of the collateral in question? 3. If there was such wrongful conversion, then what is the proper measure of damages? The letters between the parties constituted the contract. As the defendant testified: "Our agreement was finally reduced to the letters which Mr. Brock and Mr. Camp have introduced in evidence." The construction of an unambiguous contract is a question for the court. Civil Code (1910), § 4265. Therefore the question arises: Are these letters (the contract) ambiguous; are they uncertain, doubtful, indefinite, or capable of more than one construction; is the intention of the parties clearly expressed therein? While there was considerable correspondence between the parties, the material portions necessary for the ascertainment of the issues involved are as follows: Letter from Jerome Kennedy to the manager of Buckeye Cotton Oil Company, dated November 23, 1920: "Yours 22nd relative to shipping to your mill sufficient cotton seed to secure my indebtedness and outlining terms, etc. If you will be willing to store these seed until April 1st, 1921, without storage charges, and in the event your mill is out of the market or unable to meet competitive bids, and it becomes necessary in order to secure the highest market price to reship these seed, — enter into such arrangements — and agreements as will

permit me to reship and liquidate your indebtedness with the returns from the seed so reshipped, then I shall ship you around the amount Mr. Walker and I agreed upon." Buckeye Cotton Oil Company to Kennedy, November 24, 1920: "We have your letter of the 23d with regard to storing seed with us. It will be satisfactory for you to ship your seed to us, with the understanding that we will hold them until April 1st, without storage charge, and in the event we are not in the market, or unable to meet competitive bids, it will be satisfactory for you to sell these seed to some other party, and we will gladly ship them out and liquidate your indebtedness to us." Buckeye Cotton Oil Company to Kennedy, December 28, 1920: "According to our records you have shipped us for storage three cars of cottonseed containing about 91 tons. On a basis of $25.00 per ton, which is what we consider the seed about worth, you now have about $2275.00 of your account covered with these seed, as collateral. This means that you have on hand about 30 tons more, as I think you told me that you had about 120 tons in your house. Inasmuch as it will take 25 tons more to cover your account, you may ship in to us what you have on hand, and we will store them on the same basis. Please load them out to us as soon as possible, as we are anxious to get in all stored seed. This is very important to us, and we will thank you to give this your prompt attention. If your records do not agree with ours, please advise us." Buckeye Cotton Oil Company to Kennedy, March 15, 1921: "The seed market has broken again and they are now at such a low point that the seed which you have shipped us lacks $700.00 or $800.00 of covering your account. We would like for you to ship us some more seed to cover your account in full, as they are not worth more than $18.00 per ton at the present time. From the present outlook we are not going to run our mill much longer than the first week in April, and we will of course want to close out your seed prior to our closing down." Buckeye Cotton Oil Company to Kennedy, March 20, 1921: "We tried to get you over the phone today, but we were unable to reach you. The seed market has broken badly and looks as if it will break again, and, inasmuch as we are going to have to close out your seed between now and April 1st, we want you to call us over the phone immediately upon receipt of this letter and discuss this proposition." Kennedy to Buckeye

Cotton Oil Company, April 4, 1921: "With further reference to the cottonseed I have stored with your mill, beg to ask that you indulge me in this matter for six months longer. I have an average cost of $42.00 per ton in these seed. While I seriously doubt my ability to ever clear them, yet I do hope to see a more active market by October next, and hope that you will help me to hold them." Buckeye Cotton Oil Company to Kennedy, April 6, 1921: "Referring to phone conversation of even date, beg to advise that we are taking in following cars of seed which have been stored at our mill as collateral against your account: [Statement of cars and number of pounds.] We are extremely sorry that you disagree with us with regard to the way we have handled your account, as we notified you on March 15th that it would be necessary for us to close out your seed on April 1st. We again wrote you on March 30th [20th?] that we would have to close out your seed on April 1st, and, according to our conversation on April 1st, we agreed to withhold buying in these seed until Tuesday, April 5th, with the provision that you remit us by that date the value of the seed at the market price on April 5th. This you have failed to do, and as per phone conversation we are taking your seed in at the price to-day (April 6th), which is $20.00 per ton delivered Macon. Account sales will be rendered you on these seed to-morrow and we will make up a statement of your account and must ask that you pay the balance which you will be due after the seed are handled and the statement is issued, as we have carried your account as long as possible and we are unable to leave same open any longer."

As the agreement was reduced to the letters introduced in evidence, it is presumed that nothing was omitted, and it remains only to be seen whether or not they are ambiguous in their terms. The record fails to disclose an allegation that any words in the contract were indefinite, uncertain, or doubtful. It also fails to show that any parol evidence was introduced to explain any words or words in the contract. There was some evidence which attempted to vary the terms of the written contract; for example, the statement that the term April 1st in the contract meant nothing unless the defendant chose to sell; but, in the language of counsel, this was evidence tending towards the destruction, rather than the construction, of the contract. The words "We will hold them until April 1st" mean that the plaintiff agreed to hold them un-

til that date, and are capable of no other construction. And the words, "In the event we are not in the market, or unable to meet competitive bids, it will be satisfactory for you to sell these seed to some other party," meant that Kennedy had the privilege of selling these seed to some other party only in the event the Buckeye Cotton Oil Company was not in the market or was unable to meet competitive bids, and if in the market and able to meet competitive bids, and pay the "highest market price" for them, it had the privilege of buying in these seed which it held as collateral. Other portions of the contract are equally plain. Since there was nothing ambiguous in the contract, there was nothing to submit to a jury, and the trial judge properly directed a verdict.

Section 3530 of the Civil Code (1910) states the proposition that "The pawnee may sell the property received in pledge after the debt becomes due and remains unpaid." The debt originally had no maturity date and was therefore payable on demand, but the date April 1st was finally agreed upon by the parties, and the debt became due on that date. No letter specifies a due date later than April 1st, and the Cotton Oil Company was under no obligation to hold the collateral after that date, though actually holding it until April 6. The letters constituting the contract show that Kennedy recognized the right of the Cotton Oil Company to dispose of these seed on April 1, because, upon being notified that it would be necessary to do this, he did not dispute the right to do so, but asked indulgence, saying, I "beg to ask that you indulge me in this matter for six months longer." The code section referred to provides for 30-days notice before sale, *unless otherwise provided by contract.* We hold that it was "otherwise provided by contract," and that this eliminated the necessity of the 30-days notice. The contract provided that the Cotton Oil Company must hold this collateral until April 1, and the company held it that long and longer. Furthermore, this date was agreed to and put in writing by the parties more than 30 days before the sale, it having been agreed to on November 23, 1920, and the sale not being made *until* April 6, 1921. The contract unquestionably provided that Kennedy could sell to other parties only in the event the Cotton Oil Company was not in the market or unable to meet competitive bids; so this gave the Cotton Oil Company the right, under the contract, to buy them by meeting competitive bids or paying the

highest market price. Since the Cotton Oil Company had the right to buy these seed, and did buy them according to the terms of a written contract, we hold that there was no conversion of the collateral in question.

However, as to the measure of damages, we will say that even if the sale were held to be unauthorized, it would profit the defendant nothing. It is admitted that he received $21 per ton for the seed in question, and that this was the highest proved market value at the time of the sale; and if the sale had been unauthorized, the measure of damages would have been the actual value of the property at the time of the sale; and this was what the defendant received. See *Harrell* v. *Citizens Banking Co.*, 111 *Ga.* 846 (1) (36 S. E. 460) ; *Waring* v. *Gaskill*, 95 *Ga.* 731 (22 S. E. 659) ; *Campbell* v. *Redwine*, 22 *Ga. App.* 455 (96 S. E. 347).

The foregoing rulings dispose of all the issues made in the case.

*Judgment affirmed. Broyles, C. J., and Luke, J., concur.*